## PROFESSIONAL AMBULANCE SERVICE, INC. *v.* RICHARD H. BLACKSTONE ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 214420
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed December 12, 1978

*Bromberg, Appleton & Scheinblum,* for the plaintiff.

*Corporation counsel,* town of East Hartford, for the named defendant.

*Carl R. Ajello,* attorney general, and *William J. Clarke,* assistant attorney general, for the defendant Leslie Fodeman.

*Lessner, Rottner, Karp & Plepler,* for the defendant Ambulance Service of Manchester, Inc.

COVELLO, J. In this action the plaintiff seeks an injunction restraining the implementation of an alleged emergency medical services directive issued by the named defendant, Richard H. Blackstone, as mayor of the town of East Hartford. It further seeks to enjoin the enforcement of two state health department regulations, Regs., Conn. State Agencies §§ 19-73w-307 and 19-73w-404 (B) (2). The claim is made that the directive and the regulations as applied to the present case violate General Statutes §§ 35-24 et seq., the Connecticut Anti-Trust Act, and, further, that the plaintiff's property has been confiscated without just compensation contrary to the due process provisions of the Connecticut and United States constitutions.

The court finds that the plaintiff is a licensed ambulance service provider with an office and place of business in the town of East Hartford. Prior to October 3, 1977, it serviced East Hartford's emergency ambulance services requirements on a rotational basis with Trinity Ambulance Service and Maynard Ambulance Service. Most requests for emergency ambulance service originate from the police department, and prior to October 3, 1977, department policy indicated that the three ambulance companies would be dispatched by the police to an emergency scene on a rotational basis.

On October 3, 1977, Blackstone, as East Hartford mayor, advised the plaintiff that the Office of Emergency Medical Services and the North Central Emergency Medical Services Council had, on July 15, 1977, designated the Ambulance Service of Manchester, Inc., as the "R-2 service company for East Hartford." The mayor's letter indicated that that designation would become effective October 10, 1977. A copy of the mayor's communique was sent to the members of the East Hartford police department who thereafter summoned only the Ambulance Service of Manchester, Inc., to situations requiring emergency ambulance service. In addition, the town designated a single telephone number for use in a medical emergency and has widely circulated that number within the community. Further, the town council passed an ordinance prohibiting ambulance companies from advertising their services as "emergency services" or "emergency personnel."[1] As a result, the plaintiff has noted a significant reduction in the number of its calls for emergency ambulance services with a corresponding loss in revenues.

The actions claimed here to be unlawful are not directly those of Mayor Blackstone or of the council of the town of East Hartford but actually are the product of the implementation of a series of state regulations promulgated by the Connecticut department of health in furtherance of the emergency medical services program authorized by General Statutes §§ 19-73u et seq. Section 19-73ee[2] authorizes the establishment of a series of regional emergency medical service councils. The council for the

[1] Town of East Hartford, Ordinances, § 3-½-1. ADVERTISING REGULATED. ". . . Advertising: Ambulance services shall not advertise their services as emergency services or emergency personnel."

[2] "[General Statutes] Sec. 19-73ee. REGIONAL EMERGENCY MEDICAL SERVICES COUNCILS. MEMBERSHIP. There shall be established an emergency medical service council in each region. Such regions shall correspond to the comprehensive health planning agency regions . . . ."

geographic area which includes East Hartford is known as the North Central Emergency Medical Services Council. Harvey L. Kagan, president of the plaintiff, was and is a member of this council.

Among their other duties, those councils are required by state regulation to designate so-called "Primary Service Areas" for the various communities within their region.[3] A primary service area (PSA) is simply a defined or known geographic area.[4] Regulations §§ 19-73w-404 (B) and 19-73w-400 (D) both require that within each primary service area there shall be only one firm assigned for a given category of service.

Testimony and examination of the various exhibits discloses that on August 10, 1976, the North Central Emergency Medical Services Council designated East Hartford (with the exception of the United Technologies properties) as one primary service area. On the same date the council designated the Ambulance Service of Manchester, Inc., as the responder for the East Hartford service area. Those actions were thereafter approved on July 15, 1977, by the commissioner of health, again pursuant to regulation § 19-73w-404 (B). Thus, Mayor Blackstone's "directive" of October 3, 1977, was no more than a simple announcement of the state of facts created by the regional council and approved by the commissioner of health.

---

[3] Regs., Conn. State Agencies § 19-73w-404, entitled "Service Standards," reads in pertinent part: "B. ASSIGNMENT OF PRIMARY SERVICE AREA (PSA). 1. A PSA shall be assigned, in writing, by the EMS planning agency for the region(s) in which such PSA lies. Such assignment shall be approved/disapproved by the Commissioner. . . . 2. A PSA shall be assigned to only one designated response service for a given category (R1, R2, & R5) of service. . . ."

[4] Regs., Conn. State Agencies § 19-73w-400, entitled "Definitions," reads in pertinent part: "D. PSA — Primary Service Area — a specified geographic area within which there shall be one designated response service assigned as the first call service for a given category (R1 — R5) of EMS response."

With respect to the advertising ordinance, this too is reflective of a department of health regulation authorizing such a restraint.[5] Thus, the legality of the actions taken here is a function of the validity of the two underlying state regulations in issue.

Connecticut antitrust laws declare illegal not only any contract in restraint of trade,[6] but also monopolization of any part of trade or commerce.[7] Such acts are illegal even though unintentional and even though it is only the effects which create the proscribed conditions.[8] The plaintiff contends that the designation of the Ambulance Service of Manchester, Inc., as the single R2 responder for the East Hartford primary service area and the prohibition against advertising have had the effect of creating a monopoly and are in violation of these antitrust statutes. The antitrust statutes, however, authorize an exception if the activity is "specifically directed or required by a statute of this state, or of the United States."[9]

[5] Regs., Conn. State Agencies § 19-73w-307, entitled "Advertising," provides: "Ambulance services shall not advertise emergency medical services or emergency personnel for any political subdivision which has designated a phone number to be used to obtain EMS [Emergency Medical Service]. . . ."

[6] "[General Statutes] Sec. 35-26. RESTRAINT OF TRADE OR COMMERCE UNLAWFUL. Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful."

[7] "[General Statutes] Sec. 35-27. MONOPOLIZATION OR ATTEMPT TO MONOPOLIZE UNLAWFUL. Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful."

[8] "[General Statutes] Sec. 35-28. ACTS UNLAWFUL WHEN PURPOSE OR EFFECT IS RESTAINT OF TRADE OR COMMERCE. . . . [E]very contract, combination, or conspiracy is unlawful when the same . . . have the effect, of: . . . (b) fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any part of trade or commerce; (c) allocating or dividing customers or markets, either functional or geographical, in any part of trade or commerce . . . ."

[9] "[General Statutes] Sec. 35-31. EXCEPTIONS. . . . (b) [N]othing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States . . . ."

In *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, the plaintiff alleged that certain of the defendant's activities violated the Connecticut Anti-Trust Act. The defendant contended that the activities in question were authorized in a tariff approved by the public utilities commission and as such were immune from antitrust liability under the exception articulated in General Statutes § 35-31 (b). In finding that the defendant's assertion was incorrect the court stated: "Section 35-31 (b) of our General Statutes has no parallel in the federal antitrust statutes. Furthermore, in enacting this provision the Connecticut legislature also did not choose to follow the example set by several other states of specifically and unqualifiedly exempting from antitrust liability the activities of industries and other organizations subject to the supervision of the state regulatory agency equivalent to our public utilities commission. Rather, the exception authorized by § 35-31 (b) represents a narrowly drawn version of the doctrine of 'state action' immunity from antitrust liability articulated by the United States Supreme Court in *Parker* v. *Brown,* 317 U.S. 341, 350–51 . . . . The court in that case carved out an exemption from Sherman Act liability for activities 'commanded' or 'directed' by a state legislature. Ibid. Section 35-31 (b) limits that holding by purporting to immunize only activities which are 'specifically' required or directed by state or federal statutes." *Mazzola* v. *Southern New England Telephone Co.,* supra, 359. In holding that its regulation by the public utilities commission did not immunize the telephone company from antitrust liability, the court further stated: " 'It is not enough . . . that . . . anticompetitive conduct is "prompted" by state action; rather, anticompetitive activities must be *compelled by direction of the State* acting as a sovereign.' (Emphasis added.) *Goldfarb* v. *Virginia State Bar,* 421 U.S. 773, 791 . . . . 'A

reasonable limitation on . . . [the principle of state action immunity], then, requires that the state regulation be instituted by public officials and that it embody safeguards demonstrably protective of the public interest.' Teply, 'Antitrust Immunity of State and Local Governmental Action,' 48 Tul. L. Rev. 272, 289." *Mazzola* v. *Southern New England Telephone Co.*, supra, 361–62.

In the present action, the parties sought to be enjoined from alleged antitrust activities are not the officers of a private company regulated by a state agency, but are the officials of the state and municipal agencies themselves, pursuing emergency medical service functions directed by the statutes. Under those statutes, the state department of health is charged with the responsibility "for the planning, coordination and administration of a statewide emergency medical care service system."[10] Such a system is one "which provides for the arrangement of personnel, facilities, and equipment for the *efficient, effective* and *coordinated* delivery of health care services under emergency conditions . . . ."[11] (Emphasis added.) The commissioner of health is specifically authorized to promulgate regulations in furtherance of those goals, particularly in the area of transportation services.[12] Further, the statutes specifically authorize the creation of area health plans which include "(1) clearly defined geographic regions to be serviced by each provider including cooperative arrangements with other providers and

---

[10] General Statutes § 19-73v.

[11] General Statutes § 19-73u (a).

[12] "[General Statutes] Sec. 19-73w. DUTIES OF COMMISSIONER. . . . (e) . . . adopt such regulations . . . as may be necessary to develop the following components of an emergency medical service system: . . . (2) transportation services, which shall include, *but not be limited to,* vehicle type, design, condition and maintenance, life saving equipment and operational procedure . . . ." (Emphasis added.)

backup services . . . ."[13] It is evident that the totality of the mandate set out in these statutes furnishes an adequate basis and authority for the promulgation of regulations creating the primary service areas, assigning one responder to each such area and limiting or restricting the advertising of those who would provide emergency services or personnel. The court therefore concludes that the activities here in issue represent the product of specifically directed state action.

The question of whether the regulations " '. . . embody safeguards demonstrably protective of the public interest' "; *Mazzola* v. *Southern New England Telephone Co.,* 169 Conn. 344, 362; is related to the plaintiff's further assertion that his property has been confiscated through the implementation of laws and regulations that do not meet constitutional criteria concerning due process. "Lawful businesses affecting the public health, safety and welfare may be regulated under the police power of the state. *Hartland* v. *Jensen's, Inc.,* 146 Conn. 697, 701 . . . . In exercising that police power the legislature has a broad discretion, both in determining what the public welfare requires, and in fashioning legislation to meet that need. *Mott's Super Markets, Inc.* v. *Frassinelli,* 148 Conn. 481, 487 . . . . The court's function in examining the constitutionality of police legislation regulating the conduct of business is to decide whether the enactment serves some need of the *public health,* safety, convenience and welfare in a reasonable and impartial way. *Mott's Super Markets, Inc.* v. *Frassinelli,* supra . . . . The legislation and the prohibition imposed must have some rational relationship to the preservation and promotion of the public welfare. . . . If it meets this test, it satisfies the constitutional requirements of due process and equal protection of the laws. . . ."

[13] General Statutes § 19-73dd.

(Emphasis added.) *C & H Enterprises, Inc.* v. *Commissioner of Motor Vehicles,* 167 Conn. 304, 307–308. "Courts will not hold laws, ordinances or regulations adopted under sanction of law to be unconstitutional unless they are clearly unreasonable, destructive or confiscatory." *Cyphers* v. *Allyn,* 142 Conn. 699, 705.

"An act of the legislature is to be held unconstitutional only if there is no reasonable ground upon which it can be sustained. Every presumption and intendment must be made in its favor. *Lyman* v. *Adorno,* 133 Conn. 511, 514. The burden of showing that it does not rest upon any reasonable basis is upon him who asserts illegality and the court 'must assume the existence of any state of facts which can reasonably be conceived of as existing at the time of the enactment of the law.' *Carroll* v. *Socony-Vacuum Oil Co.,* 136 Conn. 49, 65." *Schwartz* v. *Kelley,* 18 Conn. Sup. 59, 62.

That there exists a need for a statewide emergency medical care system is not an unreasonable assertion by the legislature, nor is the mandate that the state be broken into identifiable geographical areas to be serviced by the various responders. In a matter of the magnitude of a medical emergency it is clearly not unreasonable to assign as goals specific geographic areas of responsibility, the designation of specifically responsible people for these areas and a limitation on the advertising of those engaged in emergency medical services as a means of assuring that the public is appropriately directed into the emergency medical services system once it has been established.

The preamble of department of health regulation § 19-73w-404 stated as its intent the "eliminat[ion of] existing problems concerning stacking of emergency calls, rotation lists, lack of accountability, etc.

. . ." and sought to create "a system of specifically assigned responsibility for all geographic areas in the state." There was no evidence that these situations did not exist nor that the stated objective was not an appropriate public purpose. Under all of the circumstances evident here, the court concludes that the plaintiff simply has not proven by a fair preponderance of the evidence that the enactments here in issue did not embody safeguards demonstrably protective of the public interest or that a reasonable public purpose was not served in their promulgation. Therefore, an assault on their constitutionality may not stand.

On the basis of all of the foregoing, judgment may enter for the defendants without costs to any party.